SCANNED at and Emailed by _____ Initials _____ 08 _____ No. _____ 338 _____ pages date 8/20/24

United States District Court
District of Connecticut

Darryl Crenshaw                    Case #    3:24-cv-00439-OAW
        Plaintiff

v.

                                   date: 8-19-24

The Department of
Corrections (D.O.C.)

Angel Quiros

                          Amended Civil Complaint

Dr. Yesu

Dr. Zuckerbraun

Michelle

Stacy

J. Brennan

Jennifer Sanchez

Colleen Frappier

W.L. Regan

                    1,
                    1

Colleen Gallagher

Dr. Kelly Wolf

Natalina

Warden Reis

2
2

## Civil Complaint

### A. Jurisdiction and Venue

1. The Defendants actions violate the United States Constitution, and the Americans with Disabilities Act, and the Rehabilitation Act. (A.D.A./R.A.), and the P.A.I.M.I. Act.. The Plaintiff alleges under 42 U.S.C. §§ 1983, 1984, 1985, 1986, and 1988. The court has jurisdiction over these claims of clear violations of federal Constitutional Rights under 28 U.S.C. § 1343(a), 1331 and 1367(a).

2. And the Rehabilitation Act of 1973, 29 U.S.C. § 794(a) Section 504, and Americans with Disabilities Act of 2009, 42 U.S.C. §§ 12101 et seq., also the Protection and Advocacy for Individuals with Mental Illness, 42 U.S.C. § 10801 et seq. and 28 C.F.R. § 35,152, §§ 42.501 et seq. 28 U.S.C. § 1915, 42 U.S.C. § 1988, and MHSA. 1980, 94, 42 U.S.C. § 9501.

3. The events given rise to the cause of actions described herein occured in the District of Connecticut, and thus venue is appropiate under 28 U.S.C. § 1391(b)(2).

### B. Statement of Facts

4. The D.O.C. as a whole and or as seperate facilities and or individuals actions and or inactions, regaurding medical and mental health services, being highly inadequate, incompetent, under staffed, and highly discriminitory, repeatedly violated the Plaintiffs Constitutional Rights, and his A.D.A. A.A. of 2008 and R.A. of 1973 rights by Deliberate Indifference and Cruel and Unusual Punishment by intentionally refusing and failing to assess, orientate, and treat the Plaintiff as Administrative Directives 10.19; 8.1; 8.4; 8.5; and 9.2, and the Department of Justice regulations of 2010 dictate re: persons with disabilities. And in this case the Plaintiff has a long documented history of mental illness since he was 2-3 months old, being diagnosed with multiple mental health disorders from then, through and up to his late teenage years, at which point he "aged out" of D.C.F. care and funding for his mental health care ran out. Plaintiff was medicated during said years with multiple cocktails of multiple different psychotropic drugs, as well as under the care of dozens of therapists, psychologists, and psychiatrists, both in inpatient and outpatient care, to treat his life long disabilities, all information that D.O.C. refuses to acknowledge so as not to be obligated to provide reasonable accomodations or mental health care consistant with community standards, and doing so because of his disabilities.

5. The Defendants in this claim are complicit in ignoring, delaying, refusing, and outright denying him the care he is due, by putting forth a seemingly conspiritorial group effort to refuse to acknowledge he is disabled. The plaintiff has been incarcerated since 2009 and has not once been properly triaged, diagnosed, or treated for his mental illness, despite having repeatedly requested care for years of his incarceration throughout multiple facilities. Upon entering each facility during intake when asked if he has mental health problems, the Plaintiff has always responded yes, to which there has never been any follow up.

6. The Defendants offerings of mental health care are severely inadequate and outdated focusing on unofficial policies and procedures that have created a culture of abuse of authority and the use of fear as a weapon in the form of entrapment by use of the key phrase/question "Do you want to hurt yourself or somebody else?", to which a positive response results in the removal of your dignity as well as your clothing and the institution of Behavioral Observation Status in solitary confinement, and a negative answer renders the individual seeking mental health care ineligible or not in significant enough need to warrant any further care or attention. These tactics are instituted to deter inmates with thoughts of self harm or otherwise violent thoughts and/or mental health issues in general

5

from "bothering" Mental Health staff. This question is often posed to inmates in full view of other inmates and or correctional staff, further subjecting the inmate to outside scrutiny and judgement, further punishment for asking for help.

7. The threat of solitary confinement should an inmate request care from Mental Health amounts to Deliberate Indifference and Cruel and Unusual Punishment and are a violation of the Bill 459 "The Protect Act" which clearly states that the D.O.C. "shall prior to placing an inmate in isolation (solitary confinement/RHU/segregation), it is required to use a less restrictive measure first." The Act also condems the practice of previous actions of punishment for informing D.O.C. of feelings of suicide, self harm, and or mutilation.

8. Administrative Directives 9.5, revised as of 10-2021 to 2023, have changed to reflect that inmates should not be and or have been given disciplinary reports (punished) for their mental illness.

9. Yet this threat is permanently held over the Plaintiffs head in a concerted effort to steer him away from obtaining help for and aknowledgment of his disabilities.

10. It is the Plaintiff's position that his continuous efforts to make Mental Health staff and D.O.C. aware of his mental health conditions and diagnoses, and their refusal to acknowledge said diagnoses or make their own, that he is treated differently than inmates with less significant mental health issues, mental health needs, and mental health histories. This fact coupled with the afore mentioned "entrapment threat", allow for Mental Health staff to abuse their power and discriminate against the Plaintiff by acting as if his disabilities did or do not currently exist, lessening their workload and obligatory fulfillment of reasonable accomodations, while having full knowledge of the psychological and physical suffering he continues to endure.

11. Inmates with less significant mental health issues and or histories with impairments like that of the Plaintiff have an easier time obtaining mental health care, clinicians stroll through the units having casual conversations and interactions with said inmates in full view and listening range to inmates and correctional officers alike, often tending to 4 to 5 inmates in the span of 20-30 minutes, rapidly fulfilling what are often mandated timely meetings with particular inmates, all of whom are not subjected to the afore mentioned "entrapment threat"

7

12. Inmates like the Plaintiff with more significant problems and disabilities, who obviously are more difficult to work with, and write Mental Health regularly, or in the case of the Plaintiff, suffer from prolonged severe insomnia and the subsequently inherited mania and delusions are often seen by Mental Health resulting from 3rd party referrals, calls from concerned correctional officers, to which Mental Health staff and this respond to as if the call had came in the middle of dinner or they were sleeping.

13. Mental Health staff arrive in the units visabley and outwardly verbally upset and agitated being confronted with having to do their jobs, while other less troublesome inmates with less significant mental health problems are called to the clinicians offices for more intimate therapy not subject to the judgement of the entire unit.

14. The Plaintiff has received less than the bare minimum of treatment and been dismissed by Mental Health staff and the D.O.C. (custody) with openly displayed and often verbalized distain at having to deal with an inmate with legitimate mental health issues. This fact has been proven time and time again when during intera-

ctions with inmates like the Plaintiff, Mental Health staff abruptly and often unnecessarily drops the "entrapment threat" to end said interaction, in a wild manipulation of power over a disabled individual.

15. This disdain manifests itself in other forms, all with the intent and design to save Mental Health staff the trouble of dealing with inmates with significant mental health problems, like the ignoring of request forms (CN 9601's) and prolonged responses to grievances and one-on-one appointments.

16. The plaintiff in this action has been disinfranchised and discriminated against by the named defendants, Medical and Mental Health staff who were directly involved and had the clear an unequivocal knowledge, information, and duty to afford and protect the Plaintiffs rights as a person with severe mental illness, that has caused him harm since an infant, regarding suffering from violent night terrors and severe insomnia, through adulthood, which severely disables him with not being able to enjoy one of lifes necessities and "Major Life Activities", the ability to sleep, as is afforded to all the other inmates.

17. Also not being able to think, concentrate, and communicate in social situations with other inmates outside but especially in-

-side his cell, the Plaintiffs aggressive mood shifts and paranoia, and his obsessive compulsive tendencies, further exacerbated during periods of sleep deprevation, make socializing near impossible.

18. Plaintiff is unable to live with or in the cell with another inmate without becoming violent or having violence committed against him resulting from his need to maintain certain compulsive tendencies and practices, outwardly violent night terrors, and paranoid ideologies, the Plaintiff believes that as in the past, an inmate placed in his cell would be conspiratorial in that the D.O.C. expects him to harm said inmate or visa-versa.

19. Plaintiff has homicidal ideations of killing his cellmate if and when D.O.C. places someone in his cell, and sucidal ideations subsequent to the said hypothetical.

20. The D.O.C. and its counterparts, agents, contractors, and employees, in their failing and intentionally discriminating against and denying the Plaintiff the proper care he requires, and treatment that would probably give him an equal standing and enjoyment of life activities and services ie sleep and participation in mental health services, is denying the Plaintiff mental health care as the A.D.A./R.A. D.O.S. regulations of 2010 dictates, as well as the U.S. Constitution.

21. The Plaintiff is alleging that the Defendants and D.O.C. as a whole and as seperate parts and individuals have subjected him to Deliberate Indifference and Cruel and Unusual Punishment by their inhumane threats and practices of discrimination of his disabilities, and that those actions coupled with the D.O.C. knowledge of his disabilities and refusal to assess, orrientate, and treat the Plaintiff, denied him equal protection ie the ability to sleep as all other inmates are afforded, and also the right to participate as other inmates in the services provided by Mental Health.

22. Also the unprofessional actions and treatment or lack thereof by the Defendants has caused severe harm to the Plaintiff in the form of psychological trauma consisting of depression, fear, anxiety, as well as numerous physical traumas and injuries resulting from the psychological trauma and lack of treatment, jeopordizing his safety and security.

23. The actions of the D.O.C. as an entity and individual Defendants did violate the Plaintiffs 8th Amendment rights as well as his 1st and 14th Amendment rights of the United States, his right to be treated humanely and afforded the decent contemporary standards of medical and mental health care, and not be discriminated against, conspired against, or retaliated against and treated as an equal with people in the same or similar circumstances or

11

conditions.

24. Under the A.D.A. of 2008/2009 as well as the R.A. of 1973, with these actions and inactions alone, the Defendants have violated the Plaintiffs rights as a disabled person by way of Deliberate Indifference; failure to treat; failure to assess and orientate, in accordance with the D.O.J. regulations 2010 and the D.O.C. Administrative Directive 10.19. Under the Rehabilitation Act of 1973, persons who are incarcerated in a prison that is funded by the U.S. federal government, have to be provided services that help provide a disabled person major life activity by way of programs, mental health care, medical care medication, devices, housing, and reasonable accommodations that give a disabled person equal access and or ability to sustain and maintain themselves, to enjoy life as every other human being in these United States of America.

25. Two major statutes exist to protect the rights of disabled prisoners: Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq. . In the prison and jail context, the Rehabilitation Act applies to facilities run by federal agencies such as the Bureau of Prisons, and to any state or local agency that receives federal funding, see Penn D.O.C. v. Yeskey, 524 U.S. 206 (1998) (holding that the A.D.A. "unmistakably includes state

12

prisons and prisoners within its coverage"), see also 28 C.F.R. §
35,152 (A.D.A. implementing regulations that apply specifically to
adult and juvenile jails, detention, and correctional facilities).

26. Different regulations may apply depending on the source of the
federal funding, for example, state and local agencies that receive
funding from the U.S. D.O.J. must comply with the D.O.J. regul-
ations, which are located at 28 C.F.R. § 42.501 et seq.

27. In 2008, in response to court decisions that narrowly inter-
preted the original text of the A.D.A., congress passed the A.D.A.
Amendments Act of 2008. The intent of the A.D.A. Amendments
Act is to make courts focus on whether entities subject to
the A.D.A. have met their obligations to disabled people, rather
than extensively analyzing whether a particular impairment is a
disability.

28. When congress amended the A.D.A. in 2008, it instructed the
courts to interpret the phrase "substantially limits" generously, thus
despite what earlier court cases may say, the A.D.A. considers a
wide range of impairments to be disabilities regardless of whether
they can be helped or controlled by medication, prosthetics, mobi-
lity devices, therapy, or other mitigating measures. Additionally, it
does not matter if a particular impairment happens to be intermi-
tant or in remission: if it would substantially limit a major

13

life activity when active", the impairment is still a disability under the A.D.A..

29. The Plaintiff is also claiming constitutional violations as well, which would fall under the 8th Amendment U.S. Constitution of Deliberate Indifference for the denial of care and treatment in accordance to the entitlements of the A.D.A./R.A. and the D.O.C. Healthcare Services Administrative Directive 8.1; 8.5; 10.19, Mental Health Services, the guidelines of which are not being instituted anyway, but are inadequate and insufficient and far from a level of "community standards" as supposed.

30. The actions and inactions of the Defendants are also Cruel and Unusual Punishment as the D.O.C. and its agents, contractors, and employees, being fully aware of the Plaintiffs punishment from the courts in the form of a 78 year sentence, sees fit to uno-fficially designate him as less than human and deny him mental health care that is supposed to be afforded to all inmates, sig-nificantly elevating the severeness of his court issued punish-ment as the Plaintiffs reality and sanity are rapidly decomposing because of his suffering increased periods of extreme insomnia, which have led to worsening night terrors with compulsive scratching, violent banging of his head which he hasnt experienced since a youth, paralyzing migranes accompanied recently by nose bleeds, and periods of extreme paranoia and delusions.

14

31. Adding to that Cruel and Unusual Punishment is the constant threat of segregation should the truth about his mental health struggles be recognized. The psychological torture of this possibility is especially cruel and unusual given the Plaintiff's history of abuse across multiple D.C.F. facilities during physical restraints, and the misuse of the "big green bag" in Acute Behavioral Care at Mt. Sinai in Hartford, of which some of those scenarios are still the subject of his night terrors.

32. The United Nations Standard Minimum Rules for the treatment of prisoners (Mandela Rules) (prohibit isolation of prisoners with psychiatric disabilities when those conditions would exacerbate their disabilities, G.A. Res. 70/175 Dec. 17, 2015).

33. The Inter-American Commission on Human Rights has established that isolation "should be absolutely prohibited ... for prisoners with psychiatric disabilities when those conditions make them worse."

34. The National Commission on Correctional Health Care states that "Mentally ill individuals ... should be excluded from solitary confinement of any duration." National Commission on Correctional Health Care, position statement on Solitary confinement (April 2016).

35. And yet the threat of torture is levied regularly, an es-

15

15

pecially cruel act from those fully aware and knowledgable of there statistics.

36. The D.O.C. is in violation of P.A.I.M.I. Act 42 U.S.C. § 10801 et seq., by not providing access for the Plaintiff to the Disability Rights of Connecticut (D.R.C.T.). The D.O.C. did not allow inmates to contact this non profit organization that is in place to advocate for them, and the Plaintiff being one of the disinfranchised, was not allowed to call D.R.C.T. via inmate legal call on the correctional facilities phones for years, until recently (7-10-23) when D.O.C. added the phone number to their legal call phone list.

37. This only took place when an inmate (Victor Jordan #165080) alerted consultant Kasey Considine, and even then, it took several months for her to get D.O.C. to comply, and all this after D.O.C. constantly interfered with Mr. Jordan and other inmates ability to privately contact D.R.C.T. via scheduled legal calls, and even after the number was added, the Plaintiff still could not contact D.R.C.T. because the inmate phone system requires a second party receiving the call to accept said call, and D.O.C. only added D.R.C.T.'s hotline number. Contact with D.R.C.T. is crucial because of the D.O.C. lack of transparency and willingness to openly inform disabled inmates of their rights.

16

38. Therefore the Plaintiff and D.R.C.T. were denied access to each other. The D.O.C. has used these same tactics with giving pseudo access to the courts by only allowing inmates to call the District Court clerks office through their counselors, and limited to only 2 calls per month, and not allowing inmates to make those calls via institutional phones or tablets.

39. These tactics are the D.O.C. modus oprendi and support the Plaintiff claims of conspiratorial discrimination against disabled inmates by trying to keep them in the dark about what it means to be disabled.

40. By way of not assessing him and properly orientating him as Administrative Directive 10.19 mandates, and the D.O.J. regulations of 2010, which are located at 28 C.F.R. § 42.501 et seq., the D.O.C. and its agents, contractors, and employees have made it a "dead end" scenario for individuals who are disabled, especially those with mental illnesses.

41. The "dead end" is the outright denying of the Plaintiffs disabilities by way of the blatant ignoring of past diagnoses, and not assessing and orientating him, which would have directed him to the proper place, person(s), and remedies. Without said direction, the D.O.C. thrives on the false narrative

that they are not in fact denying treatment or accomo-
dations, which is intentional discrimination.

42. If the Plaintiff was properly assessed and orientated or
his mental health history was recognized, then the D.O.C.
would be obligated to supply and provide him with modi-
fications and reasonable accomodations for his equal rights
to participate and enjoy major life activities, which to
the D.O.C., would be exhausting work and open the door
for other disabled inmates to they too be recognized for
their disabilities. The D.O.C in its discrimatory actions in
which inmates are given the most time and care and
which inmates disabilities are ignored with an intentional
blind eye, places the Plaintiff in compromising circumstan-
ces which decompose him and make his impairments worse,
causing severe psychological and physical injury.

43. In what happened to the Plaintiff during his constant efforts
to obtain mental health care "consistant with community standards" as
outlined in Administrative Directive 8.5 Section 7, and regularly encou-
ntering intentionally set road blocks and dead ends and arbitrary
technical hurdles set forth by the Mental Health Department
with no desire to provide even the minimal effort to aide
the Plaintiff in his mental health struggles, while inmates not
considered as problematic consistently receive more, allthough

18

still very general in nature, attention and acknowledgement, has been discriminated against and denied proper assessment, orientation, diagnosis, acknowledgement of past diagnoses, treatment, modifications, and reasonable accommodations.

44. It is the Plaintiff's position that the D.O.C., by design and with clear discriminatory intent, opts not to recognize certain inmates mental health issues and diagnoses so as not to honor the obligatory responsibilities, care, and accommodations required by law subsequent to actual and proper diagnosis. It is because of that fact that inmates with less significant mental health issues are treated preferably.

45. For example, the D.O.C. has a policy, practice, and procedure of excluding certain psychiatric diagnoses as being "untreatable", D.O.C. draws false distinction between mental health disorders such as schizophrenia and bi-polar disorder, formally characterized as "AXIS I" disorders in the A.P.A.'s Diagnostic and Statistical Manual of Mental Illness (D.S.M.-IV), and Borderline Personality Disorder (A.S.P.D.) formally characterized as "AXIS II" disorders in the D.S.M.-IV. The D.S.M. eliminated the AXIS I and AXIS II labels, but the D.O.C. false distinction between these disorders continues.

46. The D.O.C. has not made any attempts at officially diagnosing

19

the Plaintiff, despite the Plaintiffs attempts to provide his extensive and well documented history and records that reflect the facts that would help and shed light on his current issues, that he has suffered from since his initial incarceration, and had it not been for the D.O.C. and its agents and employees failure to treat and give care for his mental illnesses, the Plaintiff would have likely had a treatment plan prescribed that would have given him relief from his pain and suffering, countless violent interactions with cellmates, and enabled him to enjoy the major life activity of sleeping as well as participating in the services provided by Mental Health.

47. The Plaintiff is literally the poster child of a qualified disabled person as a result of his past mental health diagnoses and treatment, yet for close to 16 years, D.O.C. has not acknowledged this and have trivialized his mental health status, a clear and obvious and discriminatory action on behalf of clinicians and P.H.Ds contracted by the D.O.C. and beyond Cruel and Unusual Punishment and violations of his A.D.A. and R.A. rights.

48. The records attached will reflect that, on 3-4-93, Clinical Psychologist Wesley L. Vincent, PHD. from Path P.C., wrote a letter to the Plaintiff's adoptive parents concerning

20

behavioral issues and "serious impairment" resulting from anger issues, at 9 years old. (Ex. 1)

49. On 6-1-93, age 10, Robert Neems, P.H.D. issued a psychological evaluation, acknowledged diagnoses of Oppositional Defiant Disorder (O.D.D.) and Dysthymia, placement in a psychiatric crisis unit, and violent head banging during intermittant episodes of night terrors. (Ex. 2A-2D)

50. On 12-4-93, Harry Weinerman, M.D. corresponded to a Mary Sharp of Connecticare RE: diagnoses of Attention Deficit Disorder (A.D.D.), Depression, and Explosive Personality Disorder, and current medications being Prozac, Ritalin and concern over his psychological profile. (Ex. 3A-3B)

51. On 12-13-93, Clinical E.E.G. Services scan was performed with abnormal results, recomended seizure issue be addressed clinically. (Ex. 4)

52. On 2-3-94, a letter from Elmcrest Psychiatric Hospital from Shamul Beltangady, M.D. RE: medication regimen including Teyretol, Trilafon, Ritalin, and Benedryl. (Ex. 5)

53. On 2-23-95, from Bloomfield Public Schools, an individual education plan noting "socially and emotional malajusted." (Ex. 6A-16D)

54. On 5-6-95, letter from Mary S. Coley, M.D. to Lucille Brown of D.C.F. RE: D.S.M. AXIS I diagnoses of O.D.D., Major Depression, A.D.H.D., and Intermittant Explosive Disorder, and medications including Ritalin, Tegretol, Prozac, Trilafon, and Benedryl and Clonidine, as well as anti social behavior and paranoia. (Ex. 7A-7C)

55. On 7-7-95, United School District II educational evaluation by Joan Newburger, School Psychiatrist RE: history of special education needs. (Ex. 8A-8B)

56. On 7-12-95, Riverview Hospital for Children Interdisciplinary Treatment Plan RE: AXIS I diagnoses of Conduct Disorder Severe: Childhood onset Severe, Dysthymia, AXIS II diagnosis of Narcissistic and Borderline traits, severe emotional problems, new medication, Despramine. (Ex. 9A-9E)

57. On 1-9-96, from D.C.F., a Family Treatment Plan RE: previous psychiatric hospitalizations, diagnoses of A.O.D., Depression, Intermitten Explosive Disorders O.D.D., noted as a child with special needs. (Ex. 10A-10G)

58. On 5-2-96, from The Kolburne School (out of state D.C.F. placement treatment residential facility), a Development and Treatment Plan RE: noted unusual and difficult

22

behaviors noted at 3 months old, history of Depression, Anxiety, numerous hospitalizations, diagnoses of AXIS I O.D.D., A.D-H.D., Narcissistic Personality Disorder. (Ex. 11A-11J)

59. On 11-18-97, a letter from the Law Offices of Marc N. Needelman to Plaintiffs family RE: criminal charges and need for therapeutic treatment. (Ex. 12)

60. On 1-23-98, a letter from Lisa Sinkewtz, Psychiatric Social Worker at St. Francis Hospital to Cynthia Brown, Probation Officer RE: history of psychiatric hospitalizations, suicidal ideology, medications including Lithium, Ritalin, and Zoloft. (Ex. 13)

61. On 5-27-98, from A.W. Redway School at Connecticut Childrens Place, an Individualized Educational Treatment Plan RE: the necessity for special education services due to serious emotional disturbance. (Ex. 14A-14J)

62. On 6-17-98, a letter from the Plaintiffs greatest supporter and only person who has always loved him, his father Charles Crenshaw to Linda Pearce Prestly, Child Advocate RE: incident of abuse at Connecticut Childrens Place, running away, being off his medication. (Ex. 15)

63. On 7-31-98, State of Connecticut D.C.F. Special Investigation

Report RE: after thorough investigation, confirmed allegations of abuse by staff member Mr. Edwards, also first AXIS I diagnosis of Bi-Polar Disorder. (Ex. 16A-16Z)

64. On 2-29-00, a letter from D.C.F. including Jeffrey Gold, Social Worker and Sharon Cutts, Social Worker Supervisor and Janette Labelle, Program Supervisor to Attorney Adam Scott, State Prosecutor RE: being committed to D.C.F. as a child with special needs and significant history of mental health problems. (Ex. 17A-17B)

65. On 8-30-00, a psychiatric evaluation by Peter M. Zeman M.D. from the Institute of Living to Attorney Jeremy Weingast RE: life long history of disturbed and disruptive behavior, difficulty concentrating, severe anxiety, episodes of depression, explosive behaviors, medication trials, paranoia, recomendation of anti-depresant and mood stablizing medications. (Ex. 18A-18F)

66. On 9-19-00, from D.C.F., an Ongoing Individual Treatment Plan RE: current placement at Cumberland Hall Hospital, requirement for residential placement because of highly specialized needs and significant mental health issues, necessity to remain at Cumberland Hall Hospital. (Ex. 19A-19J)

67. On 5-1-01, a write up from the Plaintiff concerning an

incident of abuse at Cumberland Hall Hospital in Chatta-
nooga Tennesse, in which a staff member used what can only
be defined as a cross-face-chicken wing chokehold on
him and either choked him out cold or smashed his head,
causing the Plaintiff to blackout, awaking in an ambulance,
having supposedly had a seizure. (Ex. 20A-20D)

68. On 10-1-01, a monthly Psychiatric Progress Report from
A.B.S, The Pines Residential Treatment Center RE: necessity for
continual therapy, current diagnoses of Conduct Disorder, Depressive
Disorder, A.D.H.D., Antisocial Personality Traits, possible seizure
disorder. (Ex. 21A-21D)

69. The above listed Doctors, Clinicians, Social Workers, and both
in and out patient hospitalizations and treatment facilities and
medications listed, are only a part of the Plaintiffs history
and diagnoses, as the documents provided are only what
he could obtain. There were several more placements, many
other Doctors and medications, as well as diagnoses, some of
which are on the also attached itemized chronology pages
kept by my father. (Ex. 22A-22B)

70. Subsequent to O.C.F.'s departure from the Plaintiffs life as a
result of funding ending, Bi-Polar Depression was the last offi-
cial diagnosis he received.

71. On 7-21-09, from Uconn Health Center, results of a brain scan, shows evidence of abnormality in cerebral cortex commonly found in individuals with Chronic Depression. (Ex. 23)

72. The Plaintiff's mental health history clearly qualifies him as a disabled person, a fact he might have known had he ever been properly assessed and orientated and or allowed sufficient contact with D.R.C.T.

73. The D.O.C. has not provided proper and adequate care and treatment by way of discrimination against the Plaintiff, by their unjust labeling of his illnesses as behavioral or acting out or malingering or just being a criminal and Black, despite his many attempts to bring his mental health history to light, including most recently trying to provide Mental Health staff with documentation aquired from D.C.F.

74. The D.O.C. and its agents, contractors, and employees have a history of this form of discrimination and disregard by way of the same modus operandi, which consists of a very simple but effective act, and that is not providing the assessment and orientation that their Administrative Directive 10:19 RE: A.D.A. dictates they must follow, and the Regulations of the D.O.J., 28 C.F.R. § 42.501 et seq. that state prisons must comply with, and instead, treat as many inmates

26

as they possibly can as if any self claimed mental health issue or diagnosis is less than alleged.

75. These deliberate discriminatory intentions by the D.O.C. and its agents, contractors, and employees have disenfranchised the Plaintiff and has subjected him to decomposition of his mental health, and in doing so have caused him immense harm, pain, and suffering both psychologically and physically, for the last 16 years, and especially in recent years, he has been shown an extreme level of Deliberate Indifference by the Mental Health Department's employees, those directly in contact with inmates as well as their supervisory counterparts employed outside of the prisons, and not afforded contemporary standards of care. The fact that the Plaintiff has in all this time, since 2009, not been triaged and diagnosed by an actual psychiatrist or psychologist, considering his documented history, is outrageous, and by design.

76. And even after only recently discovering his A.D.A./R.A. rights, and informing the D.O.C. of his rights, he was still discriminated against by every Mental Health Clinician, Psychologist, and their supervisory counterparts, that he attempted to seek help from, in an obviously coordinated effort.

77. The Plaintiff has submitted numerous grievances in regard

to said discriminatory treatment to quite literally everybody, requesting accountability and treatment pertaining to the violation of his rights and the jeopardizing of his health.

78. These are the facts that support the Plaintiff's claims of violations of his A.D.A./R.A. rights and U.S. Constitution Amendments, at least for the past 3 years, and more.

C. Evidence Supporting the Statement of Facts

79. On 10-24-16 at Macdogall C.I. (M.W.C.I.), Plaintiff's earliest documented CN9601 to Mental Health RE: his desire to begin regular Mental Health sessions, previous diagnoses, need to be evaluated. Resulted in one brief meeting, no evaluation. (Ex. 24)

80. On 10-24-16 at M.W.C.I., a CN9601 to Dr. Coleman, Mental Health Supervisor RE: previous diagnoses, not being medicated, and its effect on my housing situation. Plaintiff had recently had numerous violent altercations with cellmates while in the ticket block, Mr. Coleman deferred response to the clinician that responded to the above CN9601, no evaluation. (Ex. 25)

81. On 5-24-17 at Cheshire C.I. (C.C.I.), a CN9601 RE: auditory hallucinations after days of sleep deprivation, resulted

28
CWR

in very brief meeting, clinician said elevating my Mental Health Level was not warranted due to lack of D.O.C. Mental Health history, essentially preventing further mental health care and attention. (Ex. 26)

82. On 7-16-17 at C.C.I., a CN9601 to Mental Health RE: concerns about auditory hallucinations and reality, Plaintiff had been awake for 3 of 4 days after significant physical altercation with cellmate, was waiting for him to get moved out, resulted in very brief meeting, was told his issues were not Mental Health issues and to deal with custody. (Ex. 27)

83. On 8-1-17 at C.C.I., a CN9601 to Mental Health Clinician Ms. Cartwright RE: Untreated mental health issues, resulted in brief meeting, no follow up. (Ex. 28)

84. On 9-4-17 at C.C.I., a CN9601 to Mental Health RE: Plaintiffs 74 previous cellmates and violent altercations, past diagnoses, placements, doctors, medications, need for mental health treatment and single cell status. Plaintiff was being held as single cell at this time. Mental Health gave no response and instead deferred the CN-9601 to custody as if none of the information provided amounted to relevant mental health issues. Plaintiff never met with the Supervising Psychologist who penned said response, custody never officially responded. (Ex. 29A-29D)

29

85. On 4-10-18 at C.C.I., a CN9601 to then Unit Manager Roberts, this CN9601 is a mirror duplicate of the CN9601 filed on 9-1-17 to Mental Health RE: Plaintiffs 74 previous cellmates and violent altercations, past diagnoses, placements, doctors, medications, need for mental health treatment and single cell status. This CN9601 was deffered to Mental Health, ironically. Mental Health eventually unofficially responded saying it was a custody issue, did not address mental health aspect. (Ex. 30)

86. On 8-16-18 at C.C.I., a CN9601 to Warden Erfe RE: need for more defined cell status, resulted in personal meeting with Warden in which he agreed to continue to house me as single cell status. (Ex. 31)

87. On 3-14-19 at C.C.I., a CN9601 originally filed with a new Unit Manager, a mirror duplicate of the CN9601 filed on 9-1-17 to Mental Health as well as on 4-10-18 to then Unit Manager Roberts, was in fact answered by the Supervising Psychologist, essentially clearing me of any significant mental health issues, no mention of the fact that this exact CN9601 had already been through her department at least twice prior. (Ex. 32)

88. On 6-10-20 at Corrigan C.C. (c.c.c.), a CN9601 to the Unit Manager Lt. Hacket RE: concerns about housing issues having just been transfered, resulted in brief meeting with the Lt.

and Unit Counselor, discussed current mental health issues and need for single cell, was told issue would be passed on to Mental Health, Plaintiff never got a response concerning this CN9601. (Ex. 33)

89. On 6-14-20 at C.C.C., a CN9601 to the Counselor and or C.T.O. RE: housing issues, resulted in a brief meeting with the Counselor during recreation, discussed having not yet heard from Mental Health as previous CN9601 was supposedly passed on to them, Counselor placed a call to their department, no answer. (Ex. 34)

90. On 6-17-20 at C.C.C., a CN9601 to the Counselor RE: housing concerns, resulted in a meeting with Lt. Hackett, Plaintiff told he would be housed alone and that Mental Health would reach out to him, this didn't happen. (Ex. 35)

91. On 6-19-20 at C.C.C., a CN9601 to Mental Health RE: current mental health issues and housing concerns, resulted in a response from J. Brennan only addressing the housing aspect of the CN-9601, no response or attempt to discuss any mental health complaints or issues, no in person meeting. (Ex. 36)

92. On 11-16-20 at C.C.C., a typed letter from the Plaintiff to Commissioner of Corrections Angel Quiros RE: necessity for

permanently designated single cell status, mental health diagnoses, history of violence with cellmates, Plaintiff never got a response from this letter from the D.O.C. or the Commissioner. (Ex. 37A-37B)

93. On 11-25-20 at C.C.C., a CN9601 to Unit Manager Lt. Peau RE: need for single cell status, mental health history, cellmate history, Plaintiff was assured he would remain single cell status, that Mental Health would follow up, this never took place as a result of this CN9601. (Ex. 38A-38D)

94. On 12-18-20 at C.C.C., a CN9601 to Mental Health, this CN9601 is a mirror duplicate of the CN9601 filed on 11-25-20 to Unit Manager Lt. Peau RE: need for single cell status, mental health history, cellmate history, this CN9601 resulted in zero response and was ignored entirely. (Ex. 39)

95. On 1-19-21 at C.C.C., a CN9601 to then Unit Manage Lt. Bragdon, this CN9601 is a mirror duplicate of the CN9601 filed on 11-25-20 to Lt. Peau and the CN9601 filed on 12-18-20 to Mental Health RE: need for single cell status, mental health history, cellmate history, resulted in response from Lt. Bragdon confirming single cell status while in C.C.C., also that he would forward CN9601 to Mental Health, Plaintiff did not hear from Mental Health regarding this CN9601. (Ex. 40)

96. On 1-20-21 at C.C.C., a CN9602 requesting a Health Serv-
ices Review re: CN9601 filed on 12-18-20 that Mental Health
refused to respond to. In a completely unheard of and counter
to every instructed step in Administrative Directive 9.6, J. Bren-
nan responded to said CN9602 with 3 dispositions, all wrong,
first Denied, then Rejected, then Without Disposition, in which
she noted 3 reasons for said disposition, all of which were
unjustifiable and untrue and outside the guidelines of
directives. Reason #1, false, Plaintiff did attempt internal resolu-
tion, Defendant ignored it, Plaintiff attached a photocopy and
explained it, satisfying the directive. Reason #2, it is absolu-
tely in the power of Mental Health to create Treatment
Plans for inmates with mental health issues, of which can and
has contained specific housing scenarios. Reason #3, Mental
Health Level bears no relevance on necessity of a Treatment
Plan and the only reason his level wasn't higher was becau-
se Mental Health themselves have been ignoring numerous
CN9601's and referrals from numerous Lt's pertaining to
the Plaintiff's mental health. (Ex. 41A-41C)

97. The idea that two seperate Lt's in the same facility were
sent the exact same CN9601 relevant to the above noted CN9602,
and responded without difficulty, and both Lt's relayed to me
their intent to forward said CN9601 to Mental Health from
whom I never heard from, and that said CN9601 sent dire-

ctly to Mental Health netted no response either, is symt-
omatic of the Mental Health Departments intent to ignore
significant mental health problems in inmates at all costs,
and with no empathy, and by design.

98. On 3-2-23 at C.C.C., a CN8901 filed RE: 3 consec-
utive CN9601's having gone ignored, behavior of Mental Health Clin-
ician Michelle. On this occasion, despite having written 3 cn9601's, the
only thing that could bring Michelle to the pod was a third party refer-
ral from correctional officers after the personal urging of one off-
icer in particular of the Plaintiff, having discussed with him along
with a Lt., the multiple days he'd been awake and its effect on
his "reality" ie auditory hallucinations. (Ex. 42A-42C)

99. Upon Michelles entering of the pod, Plaintiff immediately verb-
alized not wanting to speak with her, asking for a different
clinician, Plaintiff speaked to the officer who had convinced
him to see Mental Health that "she doesn't like me and I don't
like her", at which point the Lt. and other officers who had been
summoned to the pod assuming they would have to forcably re-
move the Plaintiff, appeared to have to convince Michelle to stay
in the pod, all though she very obviously and visably did not
agree with that idea.

100. After the events noted in the above mentioned CN8901 (#3631)

34
34

took place, the actions of the correctional officer that initially con-
vinced the Plaintiff it was necessary to meet with Michelle, and
subsequently sat in on said meeting, took the unprecedented step
of essentially going against a D.O.C. employee and explained to the
Lt. her disgust in the behavior and inaction of Michelle. It is
the Plaintiff's belief that this was likely documented in the Unit
Log as correctional officers, concerned about the Plaintiff's reaction
to Michelle, likely wanted to distance themselves from any liability
or fault, as was later explained to him by the officer that sat
in on the meeting, explaining her reasoning for having to discuss
the meeting with the Lt.

101. This CN3901 was Rejected under arbitrary and false pretences.
A. Plaintiff did not attach an informal resolution because the Defenda-
nt ignored all 3, Plaintiff explained and cited the relevant dir-
ective, satisfying said directive. B. The date of the incident was clear-
ly stated on two occasions in the write up C. No where in the directives
does it state that an inmate must attempt informal resolution, to infor-
mally resolve ignored attempts at informal resolution, if that was the
case, if Mental Health just never responded to any requests, ever,
no inmate could ever file a grievance.

102. J. Brennan, as the Health Services Administrative Remedy Coordinator,
is essentially the gatekeeper for medical and Mental Health care,
and has a very real policy of discounting, disregarding, and dev-

aluing the health of all inmates and prioritizing saving money for the D.O.C. and creating as little work as possible for an under-staffed Medical and Mental Health Department, and she does so by a practice of Rejecting and Denying a gross amount of Health Services Administrative Remedies (H.S.A.R.s).

103. The Plaintiff has tried to obtain through the Freedom of Infor-mation Act, an official count and percentage of H.S.A.R.s Rejected and Denied by the Defendant, but was unsuccessful, and urges the court to obtain said data.

104. Mental Health Clinicians choose, or discriminate, with whom they will allot their time and concerted effort on based often on the level of difficulty a particular inmate is perceived to be, this tactic is implemented conspiratorially behind the scenes by the Mental Health Clinicians choice and decision of what mental health mal-ady supposed by a particular inmate is legit, and what is not.

105. When a Mental Health Clinician does not want to deal with a particular inmate, which is the case more often than not, with individuals with the most significant and hard to deal with probl-ems, they will ignore an inmate entirely, or at the very least, completely devalue and understate said inmates issues and trau-ma, thus maintaining him under the radar and necessity of

further care from Mental Health.

106. On 3-2-23 at C.C.C., the Plaintiffs Mental Health records as noted/dictated by Mental Health Clinician Michelle on the date which was the subject of H.S.A.R. #3631, when pod officers saw it necessary to request Mental Health's presence in the unit because of the Plaintiffs erratic behavior, as well as summon the shift Lt. and numerous extra officers, clearly foreseeing a rapidly developing volatile situation, when the Plaintiff divulged to an officer attempting to defuse the situation the amount of days he'd been awake and concern that he was schizophrenic because of auditory hallucinations, Mental Health Clinician Michelle noted that she was "given time to discuss current stressor, non specific in nature." The plaintiff gave this Mental Health professional a history of Depression and Bi-Polar, and concern over perhaps being schizophrenic and hallucinating, and she omitted those facts from the Plaintiffs medical records, entirely. (Ex. 43A-43C)

107. Having full knowledge of the Mental Health Department and how it functions, and the educational background the Defendant possesses, she was fully aware that her discriminatory actions would negatively effect future analyzation of the Plaintiffs psychological history, as she'd left out significant points of concern and information relevant to diagnosis, quite intentionally.

108. On 3-12-23 at C.C.C., a CN9601 to Dr. Yesu RE: the issues unaddressed in the Rejected H.S.A.R. #3631, reasoning for not wanting Stacy as his assigned clinician, and need for mental health care, resulted in cookie-cutter response typically issued by Dr. Yesu, no intent shown or actually acted in effort to address the Plaintiffs concerns. (Ex. 44A-44C)

109. On 3-16-23 at C.C.C., a CN9601 from inmate Noe Taveras to Mental Health Supervisor RE: unprofessional behavior on behalf of Mental Health Clinician Stacy, whom the Plaintiff had recently found out was his assigned clinician. Plaintiff witnessed this interaction, as did the entire pod, including correctional officers. Stacy essentially dared Mr. Taveras to hurt himself or stop wasting her time, and eventually dropped the "Are you going to hurt yourself" ultimatum, which received a negative answer, at which time Stacy literally spun on her heels and departed the pod without another word. (Ex. 45)

110. That incident was the Plaintiffs reasoning behind not wanting Stacy as his clinician.

111. On 3-27-23 at C.C.C., a CN9601 to J. Brennan R.N. RE: her unjustifiably Rejected H.S.A.R. #3631, she ignored this CN9601 entirely. (Ex. 46A-46B)

112. On 3-30-23 at C.C.C., a cn9601 to Medical/Doctor/Sick Call RE: recent periods of prolonged extreme insomnia and mental health problems effects on the Plaintiffs physical health, during Sick Call, Medical expressed intent to also forward the Plaintiffs cn9601 to Mental Health, Mental Health did not respond or acknowledge said referral. (Ex. 47A-47B)

113. On 3-31-23 at C.C.C., a cn8901 RE: the same issues previously grieved in the H.S.A.R. filed on 3-2-23 that was Rejected, as well as Dr. Yesu's failure to even attempt to resolve the issues addressed, the Defendant J. Brennan Rejected this H.S.A.R. for essentially the same cookie-cutter, arbitrary and manipulative line of reasoning used to justify the Rejection of the prior H.S.A.R., a grossly negligent act considering the volume of significant and concerning mental health information provided in said H.S.A.R. (Ex. 48A-48C)

114. On 4-16-23 at C.C.C., a cn8901 RE: the same issues previously grieved in the H.S.A.R. filed on 3-2-23 and on 3-31-23, the Plaintiffs third attempt at trying to circumnavigate J. Brennan's ad-lib procedural demands, this attempt was Upheld. (Ex. 49A-49C)

115. Plaintiff, as requested for resolution in said H.S.A.R., met with Regional Psychologist Supervisor Dr. Zuckerbraun, in this

meeting, Plaintiff expressed his concerns surrounding his
mental health status and need for a compromisable clinici-
an, as well as the numerous allegations outlined in his
multiple H.S.A.R.'s, and the regular ignoring of CN9601's
by Mental Health. Everything the Plaintiff stated was with
the reasonable assumption that his grievances would be at
least investigated, at the very least looked into, especially
considering her supervisory post and charge over individuals
the Plaintiff stood accusing of wrong doing.

116. Dr. Zuckerbraun verbally assured the Plaintiff in the valid-
ity and legitimacy of his complaints, and stated that they would
be looked into as her main concern was his mental health.

117. As it turns out, the response from Dr. Zuckerbraun was meant
only in the most literal of terms, in that because the Pla-
intiff requested to voice his concerns with her, and that
in fact did take place, that was the actual solving and
hence end of the matter. No investigation or so much as
questions were asked of the individuals whose actions
the Plaintiff grieved, nor was any further consideration
given to his plea for a new clinician, as was explained at a
later point in time by Dr. Yesu, "You did not ask for an inve-
stigation" he was told.

40

118. During this brief meeting with Dr. Yosu, sometime shortly after the Plaintiffs meeting with Dr. Zuckerbraun, Plaintiff was able to read a portion of Dr. Zuckerbraun's notes on their previous meeting, in which she stated the Plaintiffs reason for not wanting Stacy as his clinician, was because he "witnessed her raise her voice at another inmate", significantly downplaying the interaction with inmate Taveras, as has proven to also be her subordinates chosen manner to manipulate inmates documented mental health to reflect less than the truth.

119. As to why this record was not provided to the Plaintiff per his request when he obtained all his other Mental Health documentation is unknown.

120. On 4-22-23 at C.C.C., documentation from the Plaintiffs Mental Health file RE: third party referral to Mental Health, experiencing extreme insomnia, migranes. (Ex. 50A-50D)

121. On 4-23-23 at C.C.C., documentation from the Plaintiffs Mental Health file RE: follow up from previous day. (Ex. 51A-51C)

122. The clinician responsible for the notes on 4-22-23 and 4-23-23 is not the Plaintiffs clinician. Her name is Sarah and it was brought to the Plaintiffs attention by a Lt. familiar with his insomnia and mental health struggles, that

because she was on call, the Plaintiff could avoid the
clinicians he didn't want to talk to and maybe get some
help, Sarah and the Lt. who urged the Plaintiff to see
her are examples of what Mental Health care should look
like, or at least how its documented. Despite all the
write ups to this point, Sarah is the only clinician who
accurately and truely documented events and conver-
sations, the first actual acknowledgement on paper of
any significant mental health struggles with the Plain-
tiff.

123. On 4-22-23 (backtracking) at C.C.C., a CN9601 to Medical/
Sick Call/Doctor RE: no sleep for over 80 hours straight, severe
migraine, CN9601 was referred to Mental Health, J. Brennan
in turn re-referred the Plaintiff CN9601 back to Medical,
Plaintiff never saw anybody. (EX. 52)

124. On 4-26-23 at C.C.C., a CN8901 RE: CN9601 pertaining to
J. Brennan's manipulation of the grievance process that she ignored,
C. Frappier used the same arbitrary and manipulative reasoning
to Reject this H.S.A.R., both reasons faulty, A. No where in
the directives does it state an inmate has to attempt informal
resolution after seeking informal resolution in order to satisfy
the criteria to file an H.S.A.R. B. Her reference to a seper-
ately filed H.S.A.R. is completely irrelevent to the one she

42
<del>MA</del>

just rejected. These are the same manipulative means J. Brennan employs to prevent H.S.A.R's from being further processed, despite her and C. Frappier's background in nursing and obligation to abide to the Nurses Code of Ethics, their first intent and priority is to find arbitrary fault in the penmanship of the disinfranchised instead of paying attention to medical needs. (Ex. 53A-53C)

125. On 5-4-23 at C.C.C., a CN9601 to Dr. Yew RE: policy of assigning Mental Health clinicians, Dr. Yew had previously stated to the Plaintiff that it was a policy based decision not to allow him to change clinicians, when the Plaintiff requested specification and justification of this alleged policy on paper, Dr. Yew changed his position. (Ex. 54)

126. On 5-5-23 at C.C.C., a CN9601 to James/Sick Call RE: Sciatic nerve pain exacerbated by extreme insomnia. (Ex. 55)

127. On 5-8-23 at C.C.C., a CN9601 to Medical Records RE: need to obtain Plaintiffs Mental Health records for civil action, this CN9601 was ignored until 6-12-23, clearly impeding the Plaintiffs ability to put together a complaint. (Ex. 56)

128. On 5-8-23 at C.C.C., a CN9601 to Jennifer Sanchez RE: complaint about J. Brennans manipulation of the H.S.A.R proc

43

ess and the CN960 filed on 3-27-23 that to date had been ignored entirely. (Ex. 57A-57B)

129. On 5-8-23 at C.C.C., a CN9601 to Dr. Yesu RE: insomnia, need of individual treatment and different clinician. (Ex. 58A-58B)

130. On 5-8-23 at C.C.C., a CN8901 RE: second attempt to grieve subject of ignored CN9601 filed on 3-27-23 after first H.S.A.R. was unjustifiably Rejected. (Ex. 59A-59C)

131. On 5-8-23 at C.C.C., a CN9602 RE: J. Beemans refusal to respond to the Plaintiffs CN9601, this was Plaintiffs attempt to force custody to intervene on behalf of him, to in force directives. (Ex. 60A-60B)

132. On 5-10-23 at C.C.C., a CN9601 to Dr. Yesu RE: incident with he and Stacy, this CN9601 was ignored entirely. (Ex. 61A-61B)

133. On 5-11-23 at C.C.C. (this document was withheld from the Plaintiff initially) documentation from the Plaintiffs Mental Health records confirming that Dr. Zuckerbroun documented an in-depth first person account of Stacy essentially threatening an inmate known for self mutilation, to either "do it or stop having them call me" in a public outburst in the presence of

44

the entire pod, as described to Dr. Zuckerbraun by the Pl-
aintiff, as "he alleged she raised her voice at another
inmate." Clearly Dr. Zuckerbrauns intent even while placating
him in their meeting, was never to acknowledge even the
possibility of wrong doing on the part of her staff, let
alone document the allegation, a biased and discriminatory
act. (EX. 62)

134. On 5-13-23 at C.C.C., a CN8901 RE: Dr. Yesu's decision
not to allow the Plaintiff to change Mental Health clinicians, J.
Brennan Rejected this H.S.A.R., despite the Plaintiffs explanation
of informal resolution attempt, and then in an unprecedented
step, claimed my matter had in fact been resolved in an
entirely seperate H.S.A.R., arbitrarily determining that the
Plaintiff had no grievable matter. (Ex. 63A-63C)

135. On 5-15-23 at C.C.C., a CN8901 RE: need for individual
Mental Health treatment, worsening insomnia, J. Brennan Rejected
this H.S.A.R. despite the attached attempt at internal resolution,
and took a step further proclaiming that Dr. Zuckerbraun having
Upheld an unrelated H.S.A.R., was sufficient to resolve this
H.S.A.R.. (Ex. 64A-64C)

136. On 5-20-23 at C.C.C., a Disciplinary Report from 5-19-23 RE:
Plaintiff being placed in segregation as pruno was discovered in

his cell (ex. 65)

137. On 5-22-23 at C.C.C., a Disciplinary Process Summary
Report RE: punitive measures taken class A contraband tick-
et, 8 days punitive segregation, 15 days loss of commissary,
15 days loss of visits. (66A-66B)

138. Upon the officers discovery of said contraband, the
Plaintiff admitted to officers that it was his, Plaintiff was
not yet intoxicated, officers were aware and accepting
of this fact as the Plaintiff was cooperative.

139. Once in segregation, being recorded during his strip
search, for the benefit and knowledge of the officers
present as well as the D.O.C. itself, the Plaintiff
self admitted to very regularly self medicating with
pruno in effort to obtain periods of sleep without
night terrors, Plaintiff proceeded to explain that Mental
Health was not providing or allowing him to participate
in individual services ie. individual sessions with a
clinician, and his mental health was at its worst.
This video was preserved by the D.O.C., (CRCC VP-23-0624).

140. On 5-31-23 at C.C.C., a cn8901 RE: ignored cn9601 to
Jennifer Sanchez about J. Brennan's manipulation of the HSAR.

46

process, this H.S.A.R was Rejected by C. Frappier stating the usual arbitrary and inaccurate reasons which were flawed and false, A. Jennifer Sanchez denied ever receiving said CN9601, which is not relevant, as the directive states you only need provide an explanation as to why its not present, but obviously the Plaintiff provided a copy, B. that copy was in fact proof of attempt at internal resolution (Ex. 67A-67C)

141. On 5-31-23 at C.C.C., a CN8902 RE: Rejected A.S.A.R. filed on 5-13-23 # 4135. (Ex. 68)

142. On 5-31-23 at C.C.C., a CN8902 RE: Rejected H.S.A.R. filed on 5-13-23 # 4136. (Ex. 69)

143. On 5-31-23 at C.C.C., a CN8901 RE: CN9601 filed on 5-8-23 that went ignored, Plaintiff requested to Medical Records to obtain his Mental Health files, this H.S.A.Re was Rejected by J. Brennan in her typical arbitrary fashion, apparently redefining what CN9601's can qualify as internal resolution attempts, and lying about dates said CN9601 was received as W.L. Reagan stated different dates after ignoring said CN9601 for weeks. (Ex. 70A-70B)

144. On 5-31-23 at C.C.C., a CN8901 RE: dizzying amount of arbitrary hoops Plaintiff was jumping through despite ign-

ored CN9601's from Jennifer Sanchez and J. Brennan while attempting to satisfy the fluctuating standard set forth by C. Frappier in order to file an H.S.A.R. that does not get Rejected, this H.S.A.R. was ironically instead Denied. (this exibit along with numerous other potential exibits and paperwork relevant to the amending of this case and future filings were destroyed in a retaliation incident at Cheshire C.I. on 8-12-24)

145. On 6-1-23 at C.C.C., a CN9601 to Dr. Zuckerbraun RE: the apparent quite literal detention she meant in our previous meeting, letting me voice my complaints, which were intentionally misdocumented, but not actually attempting to resolve or address in any way shape or fashion the issues brought forth. This CN9601 was ignored entirely. (Ex. 71A-71B)

146. On 6-6-23 at C.C.C., a letter to the Plantiff from J. Brennan RE: the Rejection of two Level 2 appeals. (Ex. 72).

147. On 6-7-23 at C.C.C., documentation of video preservation from Deputy Warden Perez RE: statements made by the Plantiff while being placed in R.H.U. surrounding his self medicating and lack of Mental Health care. (Ex. 73)

148. On 6-7-23 at C.C.C., a letter to the Plaintiff from J. Brennan RE: Plaintiff being placed on restrictive H.S.A.R. filing status. (Ex. 74)

149. On 6-7-23 at C.C.C., a CN8908 RE: Abuse Determination by the Plaintiff. (Ex. 75)

150. On 6-12-23 at C.C.C., a CN8902 RE: appeal of H.S.A.R. #4261. (Ex. 76A-76B)

151. On 6-13-23 at C.C.C., a CN9601 to Medical Records / W.L. Regan RE: Plaintiff getting the run around in being allowed to view her medical records, W.L. Regan, in a common practiced manipulation at C.C.C., back-dated her response, a day too far. (Ex. 77)

152. On 6-21-23 at C.C.C., a CN8903 RE: Plaintiff's attempt to appeal his restrictive H.S.A.R. filing status. (Ex. 78A-78B)

153. 6-26-23 at C.C.C., a letter from C. Frappier to the Plaintiff RE: unprocessed Level 2 appeal, Plaintiff did in fact have his filing in the designated box on time. (Ex. 79)

154. On 7-24-23 at C.C.C., a CN9601 to Medical Records RE: third attempt to view Plaintiff's Medical records. (Ex. 80)

155. On 7-27-23 at C.C.C., a Notice of Time Extension RE: Central Office needing more time to investigate, true to form, Colleen Gallagher's response indicating that the Plaintiff original appeal was not received, is the same arbitrary stumbling block used at the facility level when J.Brennan, C.Frazier, and Jennifer Sanchez claim that CN9601's were not received, in effort to prevent the Plaintiff from further participating in the H.S.A.R. process. All the relevent paperwork was stapled together and enclosed in one envelope. (Ex. 81)

156. On 8-18-23 at C.C.C., a Notice of Time Extension RE: More time needed to investigate Plaintiffs appeal which Colleen Gallagher had previously alledged the Plaintiff did not send, the Plaintiff sent photo copies subsequent to the previous Notice of Time Extension and had his fiance email copies directly to Colleen Gallagher emploring her to please give the Plaintiff the mental health care he needed. (Ex. 82)

157. On 8-18-23 at C.C.C., a CN9601 to Dr. Yesu RE: recent interaction, as usual, Dr. Yesu's responses on paper are vague and general, not actually answering any questions posed. (Ex. 83)

158. On 9-5-23 at C.C., a CN8901 RE: continuing attempts to obtain Plaintiff's medical records, this H.S.A.R. was upheld by somebody other than J. Brenon or C. Froppier, despite the Plaintiff having filed almost the exact H.S.A.R. while attempting to obtain his medical records in H.S.A.R. #4265 filed on 5-31-23. (Ex. 84A-84B)

159. On 9-5-23 at C.C., a CN9601 to Dr. Yesu and Dr. Zuckerbraun RE: previously ignored CN9601 to Dr. Zuckerbraun, Dr. Yesu did not address the subject of this CN9601 in his response, Dr. Zuckerbraun did not respond to this CN9601 or the one the Plaintiff brought up in the CN9601. (Ex. 85)

160. On 1-10-24 at C.C., a CN9601 to Mental Health / Dr. Yesu RE: Plaintiff in solitary confinement, decomposing mental health, requesting to be seen, Plaintiff was not visited. (Ex. 86)

161. After his time in solitary confinement with zero Mental Health treatment, Plaintiff was transferred to Cheshire C.I. (C.C.I.).

162. On 1-22-24 at C.C.I., a CN9601 to Mental Health RE: need for mental health care, this request was

ignored entirely. (Ex. 87)

163. On 1-29-24 at C.C.I., a CN9601 to Mental Health RE: second written request to be seen, this CN9601 was ignored entirely. (Ex. 88)

164. Sometime between the above noted date and the date the Plaintiff filed his next CN9601, Plaintiff did encounter the Mental Health Supervisor in North-1, conducting what appeared to be and sounded like "meetings" discussing mental health with multiple individuals, all very brief "are you okay" kinds of "chit chats", that were with individuals who have very little regular association with Mental Health, as well as some who are Mental Health Level 3, Plaintiff waited in line and interacted with Dr. Wolf, to her he explained he'd written to Mental Health twice, she acknowledged having received the CN9601's, but been to busy to respond, and questioned whether or not my issues could be addressed and settled right then, to which the Plaintiff responded he required more time, to which she responded she would get to him soon.

165. On 1-29-24 at C.C.I., a CN9601 to North-1 Unit Manager LT. Domijan RE: the Plaintiff's single cell status,

large number of attachments explaining mental health history
and history of violence with cellmates. (Ex. 89A-89B)

166. On 1-29-24 at C.C.I., copy of RT90 designating
the Plaintiffs single cell status, attachment given to Lt. Dom-
isan with CN9601. (Ex. 90)

167. On 2-5-24 at C.C.I., a CN9601 to Mrs. Wolf-Craig (now
Dr. Wolf)/Mental Health RE: mental health struggles, this request
was ignored entirely. (Ex. 91)

168. On 2-5-24 at C.C.I., a CN9602 RE: the Plaintiffs
need for single cell status, mental health history, this griev-
ance was Rejected alleging the Plaintiffs problem was not
clearly stated, untrue and arbitrarily dismisive. (Ex. 92A-92B)

169. On 2-20-24 at C.C.I., a CN8901 RE: ignored Mental Health
CN9601's, incident with Mental Health Clinician Natalina dur-
ing which she assessed, diagnosed, and dismissed the Plaintiffs
mental health status in a matter of seconds, this H.S.A.R. was
Upheld, however, what was said in the interaction between the
Plaintiff and Dr. Wolf resulting from this H.S.A.R., and what Dr.
Wolf reflected in writing on the H.S.A.R. were different, a
manipulation of the Plaintiffs medical records. In addition,
Dr. Wolf never conducted the evaluation subsequent to

the resolution of this H.S.A.R. as was discussed and noted in the H.S.A.R. response. (Ex. 93A-93C)

170. On 2-29-24 at C.C.I., a CN9601 to Deb Cruz C.H.N. RE: inordinate amount of time passing since the filing of CN8901 on 2-20-24 with no receipt, Plaintiff was concerned it was being ignored. (Ex. 94)

171. On 2-29-24 at C.C.I., a CN9601 to Vincent Santavenere C.H.N.S. RE: inordinate amount of time passing since the filing of CN8901 on 2-20-24 with no receipt, Plaintiff was concerned it was being ignored, Vincent Santavenere ignored this request entirely. (Ex. 95)

172. On 3-1-24 at C.C.I., a letter to the Plaintiff from Debra Cruz RE: acknowledgement having received CN8901 filed on 2-20-24. (Ex. 96)

173. On 3-4-24 at C.C.I., a CN9602 RE: single cell status and mental health issues, this CN9602 was Denied, and as per usual, custody, when mental health issues are mentioned, deferred to a resolution that can only be approved through Mental Health ie Reasonable Accomodations. This path is a dead end because Mental Health refuses to acknowledge the Plaintiffs mental health issues, current or past, not to mention that

54

as has happened regularly in the past at both Corrigan C.C. and Cheshire C.I, because the grieved issue is partially related to custody re housing status, Mental Health will defer to custody. (ex. 97A-97B)

174. On 3-14-24 at C.C.I., a CN9601 to Mental Health Supervisor Wolf re: Mental Health clinician Natalina's diagnosis and lack of formal response in the resolution of H.S.A.R filed on 2-20-24. This was exceptionally manipulative of Dr. Wolf as her response to this CN9601 like that of her response on the CN8901 filed on 2-20-24, was 180 degrees different, Dr. Wolf's attitude towards the Plaintiff's complaint of Natalina's diagnosis seemed of genuine concern and disappointment over this allegation, and her words gave the Plaintiff clear assurance that not only was Natalina wrong and out of line, but that Dr. Wolf would be correcting the situation, but on paper, she wrote with denial and vague generalities. In addition, the Plaintiff yet again requested a mental health evaluation having not received the one Dr. Wolf was supposed to conduct after the resolution of CN8901 #6525, she mentioned again in her response to this CN9601 that more time was necessary to conduct an evaluation, but never saw the Plaintiff to do so. (Ex 98)

175. On 3-24-24 at C.C.I., a CN9601 to Mental Health Superv-

isor Wolf RE: mental health struggles and formal complaint about Mental Health clinician Nataline, this request was ignored entirely. (Ex. 99A-99B)

176. On 4-18-24 at C.C.I., a CN8901 RE: ignored CN9601 filed on 3-24-24, Nataline's assessment, ignoring of CN9601's, insomnia, and while this CN8901 was Upheld, there were a number of misrepresentations and manipulations of the H.S.A.R. process, please note the CN9601 filed on 3-24-24 has irregular lines all throughout its page, this is because it is a photo copy of the original and the counselors copy machine was acting up. A photo copy of that photo copy is what the Plaintiff used to file this CN8901, the original did not have these "ink lines" across the entire page. On Wolf, in a blatant conflict of interest, ignored the Plaintiff's resolution to address his grievance of the Defendant with her supervisor, then photo copied the photo copy the Plaintiff used to file the grievance since she ignored it initially, responded on said photo copy of the Plaintiffs photo copy, Upheld the H.S.A.R. without her supervisors involvement, and sent the Plaintiff the resolved H.S.A.R. along with the doctored CN9601 and some sleep care pamflets This is actual physical manipulation of internal documents, further denying the Plaintiff acknowledgement and treatment of his mental health problems. (Ex. 100A-100C)

177. At C.C.I., a photo copy of the Plaintiffs photo copy that Dr. Wolf doctored and manipulated as if she had not in fact ignored the Plaintiffs original CN9601, (EX. 101)

178. Further concerning is Dr. Wolfs doctored response itself, alleging that the Plaintiff, when Dr. Wolf attempted to perform a mental health evaluation on 4-5-24, refused services, this is a lie.

179. On 5-1-24 at C.C.I., a CN9604 RE: CN9602 filed on 3-4-24, Plaintiff personally handed this form and attachments to Grievance Coordinator Arrelo, at which time he acknowledged having slipped up and not sent the Notice of Time Extension on time, apologized, and accepted the paperwork, this CN9604 was never formally acknowledged and in fact disappeared, (EX. 102)

180. On 5-17-24 at C.C.I., a CN9604 RE: the ignoring of the initial and appropriately filed CN9604 on 5-1-24, single cell, mental health struggles, lack of Due Process in previous decision. (EX. 103A-103B)

181. On 5-20-24 at C.C.I., a CN9601 to Warden Reis RE: Grievance Coordinator Arrelo's disregarding of CN9604 filed on 5-1-24, judging by the response, which was not in fact from Warden Reis herself, this CN9601 was not even read, as the response

avoided the topics the Plaintiff addressed. (Ex. 104A-104B)

182. On 5-22-24 at C.C.I., a CN9601 to Deb Cruz re: ina-
bility to obtain care from Mental Health, attachments of every
single attempt at resolution both formal and informal, attempt
to force Mental Health to provide services, during a sit down
with Deb Cruz, Plaintiff expressed denial in having ever
denied Mental Health Services as Dr. Wolf said took place on
4-5-24, Deb Cruz asserted that documentation of all refu-
sals is mandated practice, yet for the date Dr. Wolf all-
eged the Plaintiff refused services, there was no such
note on or around that day in the Plaintiffs mental
health records, Deb Cruz than encouraged the Plaintiff
to write a CN9601 in her presence that she would pers-
onally deliver to Mental Health, which the Plaintiff did
in fact do. (Ex. 105A-105C)

183. On 5-22-24 at C.C.I., a CN9601 to Dr. Kocienda re:
mirror duplicate, including attachments, of CN9601 sent to
Deb Cruz on 5-22-24, Dr. Kocienda response touched on none
of the issues the Plaintiff wrote about at all, only Dr.
Wolfs false allegation that the Plaintiff refused services.
(Ex. 106)

184. On 5-22-24 at C.C.I., a CN9601 to Colleen Gallagher re:

58

58

mirror duplicate, including attachments, of cn9601 to Dr. Kouc-
nda and Deb Cruz on 5-22-24, the Plaintiffs fiance also
sent emails to Colleen Gallagher attempting to force a response
to the Plaintiffs cn9601, this request went ignored entirely.
(this exibit along with numerous other potential exibits and
paperwork relevant to the amending of this case and future
filings were destroyed in a retaliation incident at C.C.I. on
8-12-24)

185. On 6-3-24 at C.C.I., a cn9601 written in presence of
Deb Cruz by the Plaintiff to Dr.Wolf RE: need of a mental
health assessment, hand delivered by Deb Cruz. (EX. 107)

186. On 6-24-24 at C.C.I., a cn9601 to Unit Manager Capt-
ain Blackstock RE: verification that on 4-5-24, the date Dr.
Wolf said the Plaintiff refused a mental health evaluation,
that no such incident was documented in the Unit Log as
is common procedure for any Medical or Mental Health
incident or refusals, Plaintiff also verited with the officers
working on 4-5-24 that no such call from Dr. Wolf was
answered by the two officers working that day. (EX. 108)

187. On 6-28-24 at C.C.I., cn9601 filed on 6-3-24 with
Deb Cruz, almost a month later, Dr. Wolfs response, she con-
ducted a Mental Health evaluation in the counselors office in

59
59

the unit that lasted approximately 11 minutes, during this brief meeting, the Plaintiff offered to go to his cell to retrieve and provide Dr. Wolf with proof of his significant mental health history i.e. documentation the Plaintiff has provided the court, Dr. Wolf expressed that the Plaintiff's past history and diagnoses were not relevant to his current mental health status, that her only concern was to address current issues, the Plaintiff explained that it was not possible to treat his current issues without acknowledging his past issues which were and are one and the same, at which point Dr. Wolf explicitly stated that she would only be dealing with "the now." (Ex. 109)

188. Dr. Wolf diagnosed the Plaintiff with Depression, raised his Mental Health Level to a 3, and has not met with her since.

189. On 6-28-24 at C.C.I., a CN 101902 Re: need for single cell status, to the date of this filing, Plaintiff has still not gotten a response, however A.D.A. Coordinator Blackstock has personally divulged that said request will be denied as a result of Mental Healths lack of diagnostic proof of mental health disability, this despite the Plaintiff providing A.D.A. Coordinator Blackstock with proof of "history of impairment" which per the A.D.A., is enough to qualify an individual

as disabled. (Ex. 110A-110B)

190. On 8-12-24 at C.C.I., the Plaintiff was placed in solitary confinement in an incident of retaliation. (Ex. 111)

191. Further evidence of the Plaintiffs fact based theory on Mental Health staff, including clinicians, doctors, and those in supervisory roles over said clinicians and doctors, discrimination based triaging and subsequent care or lack thereof with intent to only provide the service of participation in adequate Mental Health care to inmates on either end of the most extreme "mental health spectrum", On 8-13-24 while in solitary confinement, Dr. Wolf was buzzed in to the Restrictive Housing Unit (R.H.U.) at approximately 2 or 3 pm. As Dr. Wolf walked down the hall, 4 inmates including the Plaintiff called to her in effort to engage her in conversation pertaining to their mental health, for 3 of the inmates, this meant aggresive banging on their doors accompanied by yelling and threats of self mutilation, while the Plaintiff waited until eye contact was made and attempted verbal contact. Dr. Wolf ignored every single one of us, at which point the conversation amongst the other 3 inmates immediately became about "cutting up" in order to force Dr. Wolf to talk to them.

192. The Plaintiff, only familiar with one of the 3 inmates

61

involved in this conversation, only knew for sure the history of "cutting up" with the one individual, as said individual had only just returned from the hospital the night prior after self mutilating to the point an ambulance was required to transport him to the emergency room for stitches, the Plaintiff thought the other two individuals might just be seeking attention.

193. The Plaintiff then witnessed Dr. Wolf return from the bubble to the cell of the individual who had "cut up" the day before, and would then have him popped out for an individual meeting. Subsequent to this meeting, Dr. Wolf would exit R.H.U. the same way she came, refusing to even acknowledge the other 3 inmates, Plaintiff included.

194. The Plaintiff participated in evening recreation later that night with numerous other R.H.U. inmates, including one of the inmates Dr. Wolf ignored, and the Plaintiff was ALARMED to see that this individual who had been attempting to talk to Dr. Wolf, looked like he'd stuck his arms in a garbage disposal, LITERALLY, not fresh wounds, but unmistakable visual evidence of his history.

195. In further discussion with this individual, the Plaintiff

62

learned that he'd just been extradited from New York having served almost 17 years and came with an extensive and well documented Mental Health history, of which Dr. Wolf was not fully recognizing, as made evident by her ignoring of this inmate in a crisis situation in R.H.U. (this inmates name is Israel Bracero #378-949)

196. To the Plaintiffs point, here were 4 inmates, all in solitary confinement, all with significant mental health issues, all with at least some history of self mutilation, all of whom Dr. Wolf is absolutely familiar with, and the only individual she gave her time to was the inmate with the freshest stitches in his arm, the one she literally had to see as he'd only just returned from the hospital on second shift when she wasn't at work as her shift was over.

197. This blatant lack of empathy and will to offer preventative treatment even in the form of brief conversation to her patients, the most vulnerable and volatile in the inmate population, unless they've already committed an action that crossed a line or conspiral junction point on a Mental Health spectrum created by Dr. Wolf and her subordinate clinicians and supervisors, is a dangerous level of discrimination, as inmates in the middle of said spectrum are essentially ignored until they too have crossed into the most

extreme end of said spectrum.

198. The Defendant actions and inactions have significantly contributed to the decomposition of the Plaintiff mental health, as psychologically, the Plaintiff fears an accurate diagnosis might reflect the worsening symptoms he's been experiencing in the form of a newer more severe diagnosis than those from the past. The only facts are his loved ones pleas for him to get help are growing as his relationships with them deteriorate, and the recent diagnosis of his 16 year old daughter as having a Depressive Disorder, Anxiety Disorder, and O.C.D. are further confirmation of the Plaintiff genetic short comings. (Ex. 112)

199. The Defendants actions and inactions have significantly contributed to the decomposition of the Plaintiff physical health directly resulting from the lack of mental health treatment.

200. What for some time was only intermittant night terrors are now very common, the Plaintiff must construct a barrier of sorts in the corner where his bed meets the wall to prevent extreme injury during subconscious incidents of head banging, sometimes it works, sometimes it does not work and a correctional officer will have to be talked out of

thinking that the bump on the Plaintiff's head came from a physical confrontation with another inmate.

201. The Plaintiff has also developed a compulsive sub-concious scratching of sorts during incidents of night terrors, in one particular spot inside his hairline on the back of his head. Its common for him to wake up with small amounts of dried blood from this spot both on his pillow and under his fingernails resulting from the sub-concious scratching, aggitation and re-aggitation of this same spot while the Plaintiff is asleep. Plaintiff has attempted to remedy this malady with multiple prescriptions from D.O.C. Doctors including Clindamycin cream (before the previously noted cream, there was prescription for one other cream and a shampoo as well, as well as most recently on July the 16th of this year, another cream, all of which the Plaintiff can not name at this time as they were all destroyed in a retaliation incident on 8-12-24) and several others, but the regular re-aggitations of this sore will not allow it to heal permanently thus far.

202. These scenarios are severely exacerbated by solitary confinement and make it impossible to live with a cellmate.

203. The Plaintiff suffers from extreme insomnia, more

commonly periods of 2 and 3 days, but on the more extreme end, 4 and almost 5 days without so much as a nap. Its during these extreme periods of sleep depri- vation that the Plaintiff can not eat without soon after involuntarily vomiting soon after consumption, this has rec- ently become the cause of weight fluctuation and poor dieting leading to the recent diagnosis of the Plaintiff being pre-diabetic, after a life long history of spectac- ular physical fitness.

204. Also accompanying these periods of extreme insomnia are debilitating migraines that last for hours, sometimes days, including violent pressure and stabbing pain behind the Plaint- iffs eyes, throughout his head, and into his neck.

205. These scenarios are severely exacerbated by solitary con- finement, and make it impossible to live with a cellmate.

206. On 7-16-24 at C.C.I, the Plaintiff was admitted to Medical to see the doctor having been referred by the Unit officer C/O Shafter, as the Plaintiff had awaken after a brief nap during a period of extreme insomnia, with a severe mi- graine and a nose bleed.

207. On 8-12-24 at C.C.I., the Plaintiff was placed in

solitary confinement as the result of a retaliation incident,
the Plaintiff, having woke himself up by hitting his head on
the slab of metal mounting the bed to the wall during a
night terror early the morning of the 13th, remained awa-
ke through the remainder of his solitary confinement time
and until 8-17-24, at which point the Plaintiffs migraine
was extraordinarily severe.

208. On 8-17-24 at C.C.I., in North-1, the Plaintiff, delusional
and unsteady as described later by fellow inmates, passed
out or blacked out and fell, crashing his head into a nearby
cell door, requiring the calling of a code white, and after
Medical's evaluation, transport by ambulance to Uconn medical
center to check for head injuries, where he also recieved
multiple shots of migraine medication and Benedryl.

209. The Plaintiff is being denied the mandatory contemporary sta-
ndards of medical/mental health care by the Defendants, knowing
and or being aware of his mental illnesses, and not providing him
with the care he needs as a disabled prisoner, with a long and
well documented history of mental illness, the Defendants viol-
ated the Plaintiffs rights and caused him severe harm.

210. The Defendants violated the Plaintiffs A.D.A. 42 U.S.C. §
12132; A.D.A.A. of 2009 28 U.S.C. 1331 et seq. his R.A. of

67

1973, 29 U.S.C. § 794 Section 504.

211. The Defendants, the D.O.C. as an "entity", its agents, staff, employees, and or contractors, acted individually and or officially, independent and or collectively, made choices to deny and discriminate against the Plaintiff, who is a well documented person with a disability, in accordance with the Act and standards set forth in the Act.

212. The Defendants failure to assess and orientate the Plaintiff in accordance with Administrative Directives 8.1; 8.14; and 10.19 as mandated in law and the D.O.J. Regulations of 2010, in so doing, have committed a fraud against the United States Government and discriminated against the Plaintiff, as well as violated his U.S. Constitutional Rights.

213. This has ultimately caused the Plaintiff mental health and physical health to deteriorate and decompose, allowing him to suffer in a cruel and unusual fashion.

214. The Defendants as individuals and the D.O.C. as a whole, in their actions and inactions in maintaining outdated policies and discriminatory practices, that are so backwards and biased in these contemporary times, what

68

with all the political, humane, national, and international issues regarding mental health and prisons, from the Mandela Rules to the Protect Act.

215. The Defendants insensitivity and outright disregard for the Plaintiffs civil rights, was callous, inhumane, malicious, sadistic, and wanton in nature, actions that were quite deliberate and conspiratorial in the executing of their agenda in concert to persecute the Plaintiff.

216. There is no possible likelyhood that any one of the Defendants, given the standards of their individual professions, and the law, that they did not know and understand and accept as common place, while knowing what was being done and why and the subsequent harm and injury they caused the Plaintiff, based on his documented mental health history and repeated cries for help.

217. Plaintiff Darryl Crenshaw was denied public services, programs and activities, most notably, the service of being able to participate in Mental Health Services as was not afforded to all inmates equally, and the Major Life Activity of being able to sleep.

218. The mental and physical anguish the Plaintiff suffers

69

from, and is forced to endure without mental health care, has prevented him from sleeping, interacting in social events and sports, eating, thinking, and other activities considered Major Life Activities for inmates, including living with a cellmate.

219. Under Title II of the A.D.A., the Defendants did in fact discriminate and or denied the Plaintiffs rights due to him, and the R.A. of 1973. 29. U.S.C. § 794 sec. 504, also his U.S. Constitutional Rights.

D. Parties

220. Plaintiff Darryl Crenshaw, at all times herein mentioned, is and was an inmate, #281335, incarcerated within and for the state of Connecticut, in the custody and care of the Department of Corrections (D.O.C.) being housed at Cheshire C.I. and previously housed at Corrigan C.C.

221. First Defendant: The D.O.C. as an entity, duly organized and existing under the laws of the state of Connecticut, and a government entity. The D.O.C. employs more than 5,000 persons and is responsible for and retains authority over the operations of Corrigan C.C. and Cheshire C.I. and other state prisons, including rendering care and treatment to disab-

led persons. The D.O.C. receives state and federal funding for operations at Corrigan C.C. and Cheshire C.I. and other facilities. Both the above noted facilities received federal funds throughout the time period of the alleged acts described herein. The Defendant is being sued in its official capacity.

222. Second Defendant: Angel Quiros, the Commissioner of Corrections. Defendant as Commissioner, has final policy making and supervisory authority within all state prisons, and therefore responsible for authorizing and maintaining policies and customs challenged by the Plaintiff. At all times he was acting under the color of State Law. He is being sued in his individual and official capacity as an agent of the D.O.C., as the figure head of the state entity.

223. Third Defendant: Dr. Yew, at all times mentioned herein, the Defendant was the Mental Health Supervisor at Corrigan C.C., providing mental health care services to inmates within the facility, and responsible for the A.D.A./R.A. provisions and constitutional provisions thereof, and is being sued in his individual and official capacity.

224. Fourth Defendant: Dr. Zucker-braun, at all times mentioned herein, the Defendant was the Regional Psychology Supervisor of Corrigan C.C., providing supervision over Mental Health

care services provided to inmates within the facility, and responsible for the A.D.A./R.A. provisions and constitutional provisions thereof, and is being sued in her individual and official capacity.

225. Fifth Defendant: Michelle, at all times mentioned herein, the Defendant was a Mental Health Clinician at Corrigan C.C., providing mental health care and/or treatment to inmates within the facility, and responsible for providing the A.D.A/R.A. provisions and constitutional provisions thereof, and is being sued in her individual and official capacity.

226. Sixth Defendant: Stacy, at all times mentioned herein, the Defendant was a Mental Health Clinician at Corrigan C.C. providing mental health care and/or treatment to inmates within the facility, and responsible for providing the A.D.A./R.A. provisions and constitutional provisions thereof, and is being sued in her individual and official capacity.

227. Seventh Defendant: J. Brennan, at all times mentioned herein, the Defendant was Registered Nurse and Health Services Review Coordinator at Corrigan C.C., responsible for processing inmates grievances with impartiality to remedy medical issues with the D.O.C., and is being sued in her individual and official capacity.

72

228. Eighth Defendant: Jenifer Sanchez, at all times mentioned herein, the Defendant was a Registered Nurse, Health Services Provider, and Supervising Nurse at Corrigan C.C., in this capacity she had the authority to enforce policy, protocols, and procedures as well as supervision of her colleagues as an employee of the D.O.C. She is being sued in her individual and official capacity.

229. Ninth Defendant: Colleen Frappier, at all times mentioned herein, the Defendant was a Registered Nurse, Health Services Provider, and Health Services Review Coordinator at Corrigan C.C., responsible for processing inmates grievances with impartiality to remedy medical issues with the D.O.C., and is being sued in her individual and official capacity.

230. Tenth Defendant: W.L. Regan, at all times mentioned herein, the Defendant was a Registered Nurse in charge of Inmates Medical Records Department, responsible for providing inmates with their records, and she is being sued in her individual and official capacity.

231. Eleventh Defendant: Colleen Gallagher, at all times mentioned herein, the Defendant was a Registered Nurse and Administrative Health Services Provider for the D.O.C., and all of its Medical Departments, responsible for and with the authority to

73

enforce policy, protocols, and procedures, and oversight and supervision of her colleagues, and has final say with supposed impartial decisions in appealed grievances. She is being sued in her individual and official capacity.

232. Twelfth Defendant: Dr. Kelly Wolf, at all times mentioned herein, the Defendant was the Mental Health Supervisor at Cheshire C.I., providing mental health services to inmates within the facility, and responsible for the A.D.A./R.A. provisions and constitutional provisions thereof, and is being sued in her individual and official capacity.

233. Thirteenth Defendant: Natalina, at all times mentioned herein, the Defendant was a Mental Health Clinician at Cheshire C.I., providing mental health care and/or treatment to inmates within the facility, and responsible for providing the A.D.A./R.A. provisions and constitutional provisions thereof, and is being sued in her individual and official capacity.

234. Fourteenth Defendant: Warden Reis, at all times mentioned herein, the Defendant was the Warden at Cheshire C.I., responsible and with authority over policies and procedures within the facility, including dispositions on inmate grievances, and is being sued in her individual and official capacity.

74

### E. Capacity of Defendants

235. All named Defendants are being sued in their official capacity as part of an "Entity"; (D.O.C.); for damages, and their individual capacities for damages, compensatory, punitive, declatory, and injunctive relief, via A.D.A.A:A, 2009, 42 U.S.C. § 12102 (1) (A)(3); R.A. 1973. 29 U.S.C. § 794 (a); 28 U.S.C. § 1915; 42 U.S.C. § 1981; § 1983; § 1985; § 1986; and reasonable attorney fees, 42 U.S.C. § 1988, citing, U.S.V Georgia, 546 U.S. 151, 160, 126 S. Ct 877 (2006).

### F. Exhaustion of Administrative Remedies

236. Plaintiff has exhausted all Administrative Remedies made available to him, in accordance with the P.L.R.A. codified under, 42 U.S.C. § 1997 (a). also citing Ross v. Blake,

### G. Any Other Civil Action

237. The Plaintiff has an unrelated civil complaint, case #3:24-cv-00372-OAW.

238. The Plaintiff has filed an emergency preliminary injunction related to and part of this amended complaint.

## H. Causes of Action

### First Cause

(paragraphs 1-238 are hereby made 1-238 of this cause)

239. The Defendants as a whole "Entity" and or in part; (officially or individually); did violate the Plaintiffs A.D.A./R.A. of and under; Title II of 2009. 42 U.S.C. § 12101 et seq.; and 1973, 29 U.S.C. § 794 e (a) sec. 504. by their clear malicious and sadistic and wanton acts, in not diagnosing him and treating his long documented history of mental illnesses, actions and inactions of the Defendants, as agents, employees, and contractors, did in fact cause severe harm and injury, that was mental as well as physical in nature, in the amount of torture, which severely decomposed him.

240. His diagnosed illnesses, that have been documented since childhood, which consist of but are not limited to; Bi-polar, Depression Major, P.T.S.D., O.C.D., Anxiety, Intermittant Explosive Disorder, Oppositional Defiant Disorder, A.D.H.D., Anti-Social Personality, Borderline Personality et al; is what he had to endure, without proper unbiased Mental Health care, and the D.O.C. failure to abide by the Regulations set forth by the "D.O.J.", of 2010, and their own "Administrative Directives 10.19", mandating that the D.O.C. must assess and orientate upon intake, every inmate into any fac

ility, institution, correctional center, or prison under the D.O.C.

241. And educate and or address his or her disabilities, whether it be mental or physical in nature, and treat it accordingly to that persons legitimate diagnosis, and needs to function, with the same equal opportunity as everyone else and be accomodated reasonably to do so. The D.O.C. has failed and deliberately denied, prevented, and discriminated against the Plaintiff, to not afford him his due.

Second Cause

(paragraphs 1-238 are hereby made 1-238 of this cause)

242. Violation of Title II of the A.D.A.A.A. 2009 42 U.S.C. § 12101 et seq.; and R.A. of 1973. 29 U.S.C. § 794 e(a) Sec 504., Citing the P.A.I.m.I. (Protection and Advocacy for Individuals with Mental Illness) Act. § 10801 et seq. ch. 114. and the U.S. Constitution, 1st, 14th, and 8th Amendments.

243. Defendants all named, did in fact impede, deny, prevent, and collaborate, in one form or another, to violate the Plaintiffs rights to Due Process of his attempts to remedy his pain and anguish, concerning his mental illnesses and their effect on his physical health and well being.

244. Defendants, all named, also failed to follow and abide to the standards set forth in the P.A.I.M.I. Act 10801 et seq., by not one of them, who were all made aware of his plight, took the steps to help him regardless of the politics involved in the alleged flaws and errors in his grievances, that they either fabricated, turned a blind eye to, or intentionally and discriminatorily dismissed him, as reflected in the claim and its supporting evidence and attachments.

245. Defendants, all named, also showed Deliberate Indifference and or Cruel and Unusual Punishment, in their actions, and their inactions, regarding the Plaintiffs clear and out right cry for help, and distress of not being able to sleep as is afforded to all other inmates, also suffering from being delusional, not being able to eat and keep food down, displaying erratic behavior, and experiencing night terrors and the subconscious self abuse that comes with them, and debilitating migraines.

246. These same Defendants did in fact violate the Plaintiffs A.D.A./R.A. rights by discriminating against him because of his particular diagnoses and disabilities based on a discriminatory and manipulative unofficial "Mental Health Spectrum" conspiratorily designed by the entire Mental Health Department in concert with custody, to not provide him with proper

78

adequate care from Mental Health unless said care was the bare minum required or absolutely and unavoidably required resulting from extreme acts being threatened or committed.

247. The Defendants at Corrigan C.C. persistant attempts to only offer care they knew would only exacerbate the Plaintiffs mental illnesses by insisting he use a clinician that he established was a cause of his distress having witnessed her involvement in a traumatic interaction with another mentally ill inmate.

248. The Defendants at Cheshire C.I. bold and blatant hokus pokus diagnoses and refusal to perform adequate evaluations and assessments.

249. The Defendants actions are of some form of retaliation for him consistantly writting CN 9601's and grievances, all to deprive him of proper and reasonable Mental Health care and treatment. All the Defendants named who have ignored or responded to a letter, CN 9601, or grievance, have shown their blatant insensitivity regarding the Plaintiff and his well known mental health needs.

250. The Defendants actions in allowing the Plaintiff to suffer in distress for months on end, having full know-

ledge of his conditions, and not providing him with the contemporary standard of care to help alleviate his anguish, caused the severe decomposition of his mental health and subsequently, his physical health.

251. The Defendants as an "Entity" and or individuals did violate the Plaintiffs right to safety and security that the D.O.C. prides itself on, and his rights to proper and adequate health care, whether it be Mental health or physical health, and to be treated with equal protection and or not discriminated against because of his disabilities, race, color, or creed.

252. The Defendants failure and refusal to provide the Plaintiff with meaningful and effective medical and or mental health care that could have possibly alleviated his suffering, their actions and inactions, refusals, denials, and prevention of reasonable care, is premised on arbitrary policy, rather than his actual medical and mental health conditions, constitutes Deliberate Indifference to his physical and mental well being, in violation of the Cruel and Unusual Punishment Clause of the 8th Amendment to the U.S. Constitution and Article, First, § 9 of the State of Connecticut Constitution.

253. The Defendants provision of medical treatment, care

and benefits to other inmates, that have been and are being denied entirely or severely mitigated to Mr. Crenshaw, with callous disregard for his medical and mental health conditions, also constitute a denial of equal protection in violation of the 14th Amendment to the U.S. Constitution and Article, first, § 1 and 20 as amended by the Amendments to the Constitution of the State of Connecticut.

254. Defendants knew or should have known that the Plaintiff would be harmed and injured by their actions or lack thereof.

255. Plaintiff has been harmed and injured including but not limited to suffering daily pain, immobilarity, and loss of enjoyment of life, frustration and anxiety from being denied his rights, A.D.A./R.A.; P.A.I.M.I.; Due Process; Equal Protection to not be subjected to Cruel and Unusual Punishment by way of Deliberate Indifference, and or out right retaliation.

I. Prayer for Relief

256. Therefore the Plaintiff prays the court grant the following relief:

a) Compensatory Damages

b) Punitive Damages

c) Injunctive Relief

d) Declatory Relief

e) Reasonable Attorney Fees and Costs

f) Such other relief as this court deems just and equitable

## J. Declaration / Verification

257. I declare that the foregoing pleadings are the truth, and hereby declare, and verify that the matters alleged herein are true under the penalty of perjury. Executed at Cheshire C.I. in Cheshire CT. on   date: 8-19-24

Plantidffs signature: _____

Darryl Crenshaw #281335

Cheshire C.I.

900 Highland Ave.

Cheshire, CT. 06410

## K. Attachments

(256 pages)